IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.        No. 08-CR-1416 WJ

JOSE FERNANDO VALLECILLO-RODRIGUEZ,

    Defendant.

## MEMORANDUM OPINION AND ORDER ON THE SENTENCING MEMORANDUM OF DEFENDANT

THIS MATTER comes before the Court on the Sentencing Memorandum for Defendant Jose Fernando Vallecillo-Rodriguez, filed February 3, 2011 (Doc. 98). Defendant pled guilty to a violation of 8 U.S.C. § 1326(a) and (b), reentry of a previously removed alien. The Presentence Report ("PSR") calculated Defendant's advisory Sentencing Guidelines range under the United States Sentencing Guidelines to be 51 to 63 months. Defendant requests a variety of departures and variances, all of which the Court declines to grant.

### BACKGROUND[1]

**I.    Factual History**

Defendant was arrested by an Albuquerque police officer on charges of Driving While Intoxicated ("DWI") and Speeding on November 23, 2007. While he was incarcerated on that matter, United States Immigration and Customs Enforcement ("ICE") agents questioned him

---

[1] The factual background is based on the uncontested factual recitations in the PSR as well as those set forth by counsel in their written and oral presentations. Defendant indicated at the February 14, 2011 hearing that there were no objections to the factual recitations in terms of the criminal history and the descriptions of the prior convictions in the PSR.

regarding his citizenship, and although he claimed to be a U.S. citizen, the federal agents later determined him to be a citizen of Mexico. On February 20, 2008, Defendant was remanded into ICE custody. He admitted to being in the country illegally after a previous deportation, and explained that he had reentered through El Paso on November 20, 2007[2] by claiming to be a U.S. citizen. Defendant had returned to the United States in order to be with his mother and his two sisters, who live in Albuquerque. He also has one son, age eighteen, who lives with his mother, Defendant's ex-girlfriend. Defendant's father allegedly lives in Mexico, but he has not had contact with his paternal family or been able to find them. Prior to his deportation, Defendant had lived in the United States since the age of three, and attended school in Albuquerque through the tenth grade.

Defendant has a long and extensive criminal history, which includes crimes of violence such as second degree murder. Between 1991 and 1992 at the ages of 19 through 21, he incurred ten misdemeanor and traffic convictions for offenses including two DWIs, Open Container, Disorderly Conduct, Battery, Attempted Breaking and Entering, No Insurance, and Failure to Appear. In 1993, he was convicted on three felony counts of Auto Burglary, Aggravated Assault (Deadly Weapon), and Conspiracy to Commit Auto Burglary. In 1994, he was convicted of Second Degree Murder (Firearm Enhancement) for shooting his girlfriend in the head; he was

---

[2] Either Defendant has been back and forth between the United States and Mexico more than once, or he misrepresented this date to immigration officials. The PSR discloses that he was issued citations at the intersection of Louisiana Blvd. and Grand Ave. NE on August 29, 2006 for driving without a license or insurance; that he was convicted in Bernalillo County Metropolitan Court of two misdemeanor counts on November 11, 2006 under a false name and social security number; and that he was arrested on September 8, 2007 on Battery–Domestic Violence charges in connection with an incident at a motel on University Blvd. NE. This indicates that Defendant was evidently present in Albuquerque, New Mexico on all of those dates.

sentenced to sixteen years' imprisonment and two years' parole. After serving this sentence,[3] he was deported to Mexico on July 24, 2003. On November 11, 2006, at age 35, he was convicted of two misdemeanors, Simple Battery and Failure to Appear, after he hit his son in the face when the fourteen-year-old boy refused to hand him a cellular phone. This extensive list of convictions does not even include five arrests on charges including DWI and Speeding as well as an alleged domestic violence battery committed against another girlfriend in 2007; more than forty other misdemeanor and felony charges that were dropped in exchange for a guilty plea or were dismissed; or the four pending misdemeanor counts (including another DWI) in the case which led to the instant felony reentry charges.

## II.     Procedural History

Defendant was indicted on June 24, 2008 on one count in violation of 8 U.S.C. § 1326(a) and (b), felony reentry. On May 20, 2010, Defendant pled guilty to the charge in the indictment pursuant to Fed. R. Crim. P. 11(c)(1)(C). According to the PSR, the base offense level is 8, with a 16-level increase under U.S.S.G. § 2L1.2 for the second-degree murder conviction,[4] a 3-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, and a 1-level reduction for an appeal waiver under U.S.S.G. § 5K3.1. The adjusted total offense level is therefore 20. Defendant received 8 criminal history points, based on one misdemeanor conviction (two points)

---

[3] Defendant only served eight years in the Department of Corrections because he earned good time credits.

[4] While the 16-level enhancement to Defendant's offense level was based on his second degree murder conviction described in paragraph 32 of the PSR, the Court notes that Defendant's conviction for the crime of aggravated assault with a deadly weapon as described in paragraph 31 of the PSR would also trigger the 16-level enhancement if Defendant did not have the second degree murder conviction. The Court agrees with the United States that Defendant "is amply qualified for the 16-level enhancement." Resp. at 2 (Doc. 105).

and two felony convictions (three points each), placing him in category IV. This results in an advisory Guidelines sentencing range of 51 to 63 months' imprisonment. The plea agreement allows Defendant to argue for adjustments, departures, or variances from this range.

Defendant's sentencing memo argues for a 38-month sentence, essentially time served (Defendant has been in custody since his November 2007 arrest). To support this reduced sentence, Defendant advances six different arguments: (1) the Guidelines range fails to take into account Defendant's individual circumstances and is not based on empirical evidence; (2) this below-Guidelines sentence is sufficient to meet the needs of deterrence due in part to the fact that Defendant will not be permitted to return to the United States; (3) Defendant meets the criteria for a cultural-assimilation downward departure; (4) as a deportable alien with serious medical and mental health issues, the conditions of confinement for him have been and will continue to be unusually harsh; (5) this below-Guidelines sentence would ameliorate unfairness resulting from double-counting a conviction that is almost too old to count; and (6) a below-Guidelines sentence would properly reflect Defendant's reduced culpability for the 1994 offense, committed when he was under the age of twenty-five, the age when the human brain is fully developed. The United States argues that the Guidelines sentence was correctly calculated and is an appropriate reflection of the 18 U.S.C. § 3553(a) factors.

## DISCUSSION

**I.      Legal Standard**

After *United States v. Booker*, 543 U.S. 220 (2005), courts are no longer required to sentence defendants within the prescribed Guidelines range. However, a district judge must still begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide

consistency, the Guidelines should be the starting point and the initial benchmark." *Id.* The initial calculation includes any upward or downward departures warranted under the Guidelines. After calculating the Guidelines range, the judge must give both sides the opportunity to argue that a Guidelines sentence is not appropriate—"perhaps because . . . the case at hand falls outside the 'heartland' to which the [Sentencing] Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007) (citation omitted). If the judge decides to impose a sentence outside the Guidelines range, he must ensure that his justification for the variance is sufficiently compelling to support the degree of the variance. *Gall*, 552 U.S. at 50. The Supreme Court has declared it "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* The need for a sufficient justification stems from the fact that the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46.

Any sentence that the judge chooses to impose—whether within the Guidelines range or not—must comport with the goals of sentencing as set forth in 18 U.S.C. § 3553(a). An appropriate sentence will: (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (b) afford adequate deterrence for criminal conduct; (c) protect the public from further crimes of the defendant; and (d) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* § 3553(a)(2). Furthermore, in determining whether a Guidelines sentence adequately serves these goals, the court should consider the following factors: "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of

sentencing . . .; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita*, 551 U.S. at 347-48 (citing 18 U.S.C. § 3553(a)). Finally, in all cases, the court must impose a sentence sufficient, but not greater than necessary, to comply with the goals of sentencing. *Id.* at 348.

## II.     Analysis

### A.     Empirical Evidence

Defendant advances a two-part argument in this section: first, that the criminal history rules and § 2L1.2 are not based on empirical evidence, and second, that they are not tailored to Defendant's individual circumstances. Primarily, the Defendant takes issue with the harshness of the 16-level increase of U.S.S.G. § 2L1.2(b)(1)(A)(ii) and the resulting length of the Guidelines sentence for illegal reentry. Defendant cites *United States v. Galvez-Barrios*, 355 F. Supp. 2d 958 (E.D. Wis. 2005), for the proposition that this provision was adopted without the usual empirical research. In fact, *Galvez-Barrios* made no such finding, but merely quoted an article from a legal journal which advanced that argument in 1996. *See id.* at 962 (citing Robert J. McWhirter & Jon M. Sands, *Does the Punishment Fit the Crime? A Defense Perspective on Sentencing in Aggravated Felony Re-entry Cases*, 8 Fed. Sent'g Rep. 275 (1996)).

However, even if it were evident that no empirical research supported the Guidelines provision, that would at most indicate that a district court does not abuse its discretion in expressing a policy-based disagreement with the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007). It certainly does not indicate that a district court *must* express disagreement with the Guidelines, or that a departure or a variance is warranted in an otherwise ordinary case.

Congress has made the determination that reentry into the United States of a deported alien is a felony crime carrying up to two years' imprisonment. 8 U.S.C. § 1326(a). Congress has also determined that if the deportation was subsequent to the commission of an "aggravated felony," the crime may carry up to twenty years' imprisonment. *Id.* § 1326(b)(2). Therefore, Congress has evidently decided that felony reentry offenses, while perhaps less serious than other felonies, still deserve a significant sentence. The Guidelines reflect this determination, and the Court declines to express a policy disagreement with them.

Most importantly, the Court does not find that Defendant's individual circumstances are so different from the "heartland" of cases as to justify a disagreement with and departure from the Guidelines provision. In this southwest border district, the Court sees many defendants in illegal reentry cases who speak English, have family in the United States, have spent most of their life in the United States, and do not have any meaningful ties to Mexico. Unfortunately for Defendant, his situation is common. Furthermore, a defendant with extensive criminal history that includes crimes of such violence as second degree murder and aggravated assault with a deadly weapon does not have a good argument that his "individual circumstances" justify a sentence lighter than those imposed in the "heartland" of cases.

**B.     Deterrence**

Defendant argues that a shorter sentence would serve the goals of "incapacitation and deterrence" because he will be deported after serving the sentence and will not be permitted to return to the United States. He claims that avoiding more prison time will be sufficient deterrence to ensure that he will not commit the crime of illegal reentry again. The Court finds this claim implausible. Defendant had already served a lengthy prison term in the United States before being deported the first time, and he must have understood the penalty for reentry was

more prison time. Clearly, the idea of prison did not stop his first reentry, and the Court does not find that it will prevent a second illegal reentry. The Court will not grant a departure or variance on this ground.

### C. Cultural Assimilation

Defendant next asks for a downward departure on the basis of cultural assimilation under U.S.S.G. § 2L1.2 cmt. n.8. The November 1, 2010 edition of the Sentencing Guidelines recognizes cultural assimilation as a basis for a possible departure. The cultural assimilation provision states:

> Such a departure should be considered only in cases where (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegally reentry or continued presence in the United States, and (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant.

U.S.S.G. § 2L1.2 cmt. n.8. Contrary to Defendant's assertion, this provision does not significantly alter the law in this circuit. *See United States v. Galarza-Payan*, 441 F.3d 885, 889-90 (10th Cir. 2006).

The Guidelines authorize a departure if the Court feels it is appropriate upon consideration of the following factors: (1) the age Defendant began residing continuously in the United States; (2) whether Defendant went to school in the United States; (3) the duration of Defendant's continued residency; (4) the duration of Defendant's presence outside the United States; (5) the nature and extent of Defendant's familial and cultural ties; (6) the seriousness of Defendant's criminal history; and (7) whether Defendant engaged in additional criminal activity after reentering the country illegally. The Court need not consider all of these factors because it finds that the last two weigh heavily against a departure on the basis of cultural assimilation.

As already discussed, Defendant has an extensive criminal history, during which he has put the public at risk by using controlled substances on public roadways and disobeying numerous traffic laws. He has a DWI conviction and has been arrested for three other DWIs, including the pending charges that led to this case. Additionally, Defendant has a history of serious violence against other people in his life. He has pled guilty to punching his son in the face when the fourteen-year-old boy would not hand him a cell phone, and entered a no contest plea to shooting his girlfriend in the head, resulting in her death. He has also been arrested on allegations that he hit another girlfriend in the eye in a motel room after having sex. Much of this criminal activity occurred after his illegal reentry into the United States. *See supra* note 1.

The Guidelines clearly state that a cultural assimilation departure should be considered only in cases where "such a departure is not likely to increase the risk to the public from further crimes of the defendant." U.S.S.G. § 2L1.2 cmt. n.8. To counter this apparently disqualifying language concerning risk to public safety, Defendant attaches to his Sentencing Memorandum the Forensic Psychological Risk Assessment Evaluation of Defendant performed by Eric Westfried, Ph.D. *See* Def.'s Ex. (Doc. 98-1). Dr. Westfried offers his professional opinion that the Defendant presents a low to moderate level risk for future violent recidivism, an opinion that I do not share.

Considering the history and characteristics of Defendant, including his lengthy and violent past criminal history, I find that Dr. Westfried's opinion regarding the likelihood of criminal recidivism by Defendant does not merit any deference. For one thing, Dr. Westfried's judgment on Defendant's low to moderate risk of recidivism is premised on an expectation that Defendant would refrain from substance abuse and participate in treatment for his anxiety and depression. *Id.* at 13. But given the number of offenses related to Defendant's substance abuse,

Dr. Westfried's opinion regarding the likelihood of successful treatment for Defendant rests on tenuous grounds. Dr. Westfried also stated that there is a potential for Defendant to "behave in an impulsive manner, such as that involved in his behavior when he returned to the United States because of feeling estranged from his family." *Id.* at 12. Yet there is no explanation by Dr. Westfried as to why Defendant would not again experience these same "destabilizers" he experienced previously when deported to Mexico. Furthermore, much of Dr. Westfried's opinion assumes that Defendant's reporting is credible. For example, Dr. Westfried quotes Defendant himself as saying: "This is my first and last illegal entry (because) I don't want to be incarcerated no more." *Id.* at 10. However, Defendant's self-reported deportation and reentry history is suspect, which undermines his credibility. *See supra* note 2. Accordingly, the Court finds that Defendant's criminal behavior is most likely to continue and that there is a strong need to protect the public from further crimes by Defendant.

If this Defendant could qualify for cultural assimilation, any defendant could. The Court has serious concerns about a cultural assimilation claim by a defendant with a history of violence including second degree murder, and wonders exactly what culture Defendant believes he has assimilated into. The Court cannot find that Defendant has been a law-abiding, productive member of society, either before or after his deportation to Mexico. This case is not about an illegal immigrant living and working in the United States to better himself and his family in the pursuit of the American dream. The Court will not grant a downward departure on the grounds of cultural assimilation.

### D.    Harsh Conditions of Confinement

Defendant argues that he should receive a lower sentence to account for the fact that he is serving time in a local prison that lacks many of the programs available in federal prison, and

that he is ineligible for early release or confinement in a minimum-security prison. The Court recognizes that prior decisions from this district have granted departures on this ground; however, the Court does not find that these conditions are unusual in reentry cases or that Defendant's conditions are particularly acute or harsher than those experienced by inmates serving sentences on similar charges. Moreover, the Court would have sentenced Defendant much earlier for this illegal reentry offense had Defendant not requested so much additional time to prepare for his sentencing hearing. The Court does not find any merit to Defendant's argument that he should receive a below-Guidelines sentence on his allegations of harsh conditions of confinement.

### E. Double-Counting

Defendant's 1994 conviction for second-degree murder is taken into account in calculating his sentence with respect to both his offense level (for the 16-level enhancement) and his criminal history category. Furthermore, it has played a large role in the Court's analysis supporting its decision not to depart downward or grant a variance. Defendant argues that this is unfair, as he served his time on that conviction and the conviction is almost too old to be counted (as it would be if it had occurred two years earlier). However, the Court believes that the large role played by the second-degree murder conviction in calculating Defendant's sentence accurately reflects the seriousness of that offense. Defendant's criminal history is what it is, and the U.S. Sentencing Commission, in promulgating the Guidelines, determined that for purposes of calculating criminal history points for a criminal history category, there would be time periods applicable to determine whether certain offenses were countable for criminal history points. *See* U.S.S.G. § 4A1.2(e). However, the Sentencing Commission did not set forth applicable time periods for calculating whether certain offenses trigger the 16-level enhancement. *See id.* §

2L1.2 cmt. n.1(B)(vii). The Court will not second-guess the wisdom of the Sentencing Commission.

      **F.**      **Reduced Culpability**

Lastly, Defendant argues that since cognitive abilities are not fully developed until the age of twenty-five, as recent brain science reveals, his criminal history before that age should be discounted. His felony for second-degree murder was committed when he was twenty-two years old, some four years beyond the age of majority. The Court notes that Defendant's criminal history did not stop at the age of twenty five. The Court further notes that most twenty-two year olds' brains have developed fully enough not to commit murder. Defendant cannot absolve himself of the consequences of his own actions by blaming "impaired mental function" due to youth. This argument is devoid of merit and the Court will not grant a variance on this ground.

## CONCLUSION

A sentence within the correctly calculated Guidelines range of 51 to 63 months is justified because it takes into account the seriousness of Defendant's offense, it promotes respect for the law and provides just punishment for the offense, it affords adequate deterrence for criminal conduct, and it will protect the public from further crimes of the Defendant. Moreover, a Guidelines sentence in this case avoids unwarranted sentencing disparities among defendants with similar records who have been convicted of illegal reentry offenses. Finally, a Guidelines sentence in this case is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of 18 U.S.C. § 3553(a). Accordingly, Defendant's request for a sentence of 38 months is DENIED.

      **SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE